UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Christine R. Mullen**

     **v.**                      Civil No. 07-cv-372-PB
                                Opinion No. 2008 DNH 137

**Earl L. Kalil, Jr.**

### MEMORANDUM OPINION

Christine Mullen appeals from a decision of the United States Bankruptcy Court for the District of New Hampshire rejecting her claim for breach of fiduciary duty against her ex-husband and former attorney, Earl Kalil, Jr.  Mullen argues that the court erred when it concluded that her claim was deficient because she failed to prove damages arising from the alleged fiduciary breach.  For the reasons stated below, I affirm the judgment of the bankruptcy court.

### I.  BACKGROUND

#### A.  Factual Background

Mullen and Kalil married in 1973, separated in 1993, and divorced in 1997.  Kalil is an attorney and, while the parties

were married, Mullen worked in Kalil's law firm performing bookkeeping, typing, title searches, and related duties.  The parties entered into a Permanent Divorce Stipulation in 1997, whereby Mullen was awarded the marital home with Kalil remaining as an obligor on the property mortgage.

After Mullen and Kalil separated, but before their divorce became final, Mullen decided to open an athletic club in Portsmouth, New Hampshire.  She entered into a twenty-year lease with the owners of the real property, the Mitchell A. Hyder and Edward A. Hyder Irrevocable Trust of 1993 (the "Hyder Trust").  With the assistance of an attorney, John Springer, she established two new New Hampshire corporations:  K&W Fitness, Inc. was formed to operate the athletic club, and Raynes Realty, Inc. was formed to serve as owner of the long-term lease.

To finance the first phase of the project, Mullen contributed approximately $1.4 million of her own funds and obtained a $300,000 loan from the Bank of New Hampshire, secured by Raynes Realty's leasehold and a third mortgage on her marital home.  Mullen later obtained a $575,000 loan from the First Alliance Bank and a $250,000 loan from the Hyder Trust (the "Hyder Note") to complete the project.

-2-

In late 1998, Mullen decided to sell the marital home to help finance the business, but the Bank of New Hampshire refused to release its $300,000 mortgage on the property.  Mullen sought Kalil's assistance and Kalil negotiated with the bank on Mullen's behalf.  Ultimately, the bank agreed to release its mortgage in return for Kalil's personal guaranty.  Mullen and Kalil then entered into an Amended Stipulation in December 1998, whereby they agreed that Mullen would sell the home by June 1, 1999, and use proceeds from the sale to pay off the first and second mortgages.  Under the stipulation, Kalil was obligated to continue making mortgage payments through May 1999 or until the property was sold.

Around this time, Kalil assisted Mullen by negotiating a discounted payoff of the First Alliance loan.  He also negotiated a discounted payoff to a company that had leased equipment to the fitness club, The Bancorp Group.  Mullen sold her home in early 1999 and used the proceeds to pay off the first and second mortgages on her home, the discounted First Alliance loan, and $76,000 of credit card debt.[1]

---

[1] Kalil benefitted from the sale of the home by avoiding $15,000 in mortgage payments that he otherwise would have been

In July 2000, Kalil notified Mullen and the Bank of New Hampshire that he would not renew his personal guaranty of the bank's $300,000 loan because Mullen had refused to allow him to review the athletic club's financial information.  The bank officially notified Mullen in May 2001 that it would not renew the loan upon its maturity on July 1, 2001.

In the spring of 2001, with the business consistently failing to meet expectations, Mullen decided to sell the leasehold.  She engaged Kalil on a contingent fee basis to represent her in the sale.  Kalil found one potential buyer, Steven Binnie, who offered $1 million for the leasehold in April 2001.  At Mullen's direction, Kalil made a $1.6 million counteroffer.  Binnie rejected the counteroffer, however, and informed Kalil that he was no longer interested in purchasing the leasehold.

Mullen again sought Kalil's assistance in June 2001 when the $300,000 Bank of New Hampshire loan was about to come due.  This time, she agreed to assign her lease on the property to Kalil in exchange for Kalil's agreement to forgive certain debts, to make

_____

obligated to make pursuant to the amended stipulation of December 1998.

-4-

payments on her behalf to various creditors, and to allow Mullen
to remain in possession of the premises for three months rent-
free.  In addition to making rental payments to the Hyder Trust,
payments on the Hyder Note, and payments on the Bank of New
Hampshire note, Kalil also paid real estate taxes on Mullen's
behalf, advanced her $5,000 for payroll, forgave approximately
$4,000 of legal fees owed by Mullen to Kalil's law firm, and
assumed Mullen's obligations on the Bank of New Hampshire note.[2]
Kalil and Mullen also entered into an Option and Rental Agreement
that obligated Mullen to make rental payments of $12,500 per
month to Kalil but deferred the due date for the first payment
until October 1, 2001.  The agreement also gave Mullen the option
to repurchase the lease if she repaid Kalil the amounts he had
advanced under the agreement, plus ten percent interest.[3]

---

[2] Kalil signed a Note Modification and Assumption Agreement
with the Bank of New Hampshire on July 31, 2001.  Pursuant to
this agreement, the note was modified and extended and Kalil
became the primary obligor.  The Bank offered to discharge Mullen
from her obligations with respect to the note in exchange for a
release of possible claims against the bank.  It is unclear from
the record whether Mullen accepted this offer.  In any event,
Kalil paid off the note in November 2001.

[3] The Option and Rental Agreement required Mullen to make
the following payments to recover her right to the leasehold:
(1) all rental payments made by Kalil to the Hyder Trust, (2) all

Kalil notified Mullen in September 2001 that if she did not make timely rental payments, he would consider her tenancy terminated and would take immediate possession of the property pursuant to the Option and Rental Agreement.  Mullen made rental payments in October, November, and December 2001.

Mullen received an unsolicited letter of intent to purchase the athletic club for $500,000 from JFZ, LLC, in late 2001.  She asked Kalil to represent her in the negotiations with JFZ, and Kalil and JFZ's attorney began drafting a proposed purchase and sale agreement.  The parties planned a December 27, 2001, closing which was postponed several times because the parties were still finalizing terms and exchanging documents.  On January 2, 2002, JFZ's lawyer sent Kalil a letter stating that he needed additional documents from Kalil and requested confirmation that Kalil intended to close the transaction.  The parties scheduled a

---

payments made by Kalil on the Hyder Note, (3) all payments made by Kalil on the Bank of New Hampshire note, (4) the payoff balance on the Bank of New Hampshire note, (5) the legal fees she owed Kalil's law firm ($4,052.72), (6) the payroll advance ($5,000), (7) "any other payment made by Landlord [Kalil] at his discretion so as not to cause the Lease or any outstanding notes to go into default," and (8) interest at the rate of ten percent per year on all payments made by Kalil.  Option and Rental Agreement at ¶ 6.

meeting for January 11, 2002.  At the meeting, Kalil informed JFZ that he was now the owner of the business and JFZ had to negotiate with him, not Mullen.  JFZ ended the negotiations.

Mullen failed to make her January 1, 2002 rental payment. The parties disagree as to whether Kalil terminated the lease in response or whether Mullen willingly turned over the business. It is undisputed, however, that Mullen executed documents assigning the assets of K&W Fitness to Kalil in late January or early February 2002.  In exchange for the assets, Kalil agreed in a statement of consideration to forgive specified debts totaling $78,383.58 and pay off "at Buyer's sole discretion" other unspecified debts that Mullen owed to third parties.

The business continued to lose members and money, and Kalil sold the equipment and remaining memberships in October 2002 for $100,000.  He paid off the Hyder note in November 2002, paid off other unspecified debts, and spent over $100,000 on renovations and repair.  He finally sold the leasehold in 2006 for $500,000.

B.   **Procedural History**

Mullen filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code on June 2, 2003. She both identified Kalil as a creditor and listed a claim for

breach of good faith and fair dealing against him as a contingent claim.  Because the Chapter 7 Trustee was unable to find counsel to pursue the claim on a contingent fee basis, the claim was not heard as part of the bankruptcy case and the Trustee filed a Report of No Distribution with the bankruptcy court.  Mullen received her discharge in January 2004, and the bankruptcy case was closed.  In March 2004, Mullen attempted to reopen her case to pursue her claim, but she voluntarily withdrew the pleadings in the face of opposition by the United States Trustee's Office.

In April 2004, Mullen filed suit against Kalil in Rockingham County Superior Court asserting claims for breach of fiduciary duty, violation of New Hampshire's Consumer Protection Act, misrepresentation, assumpsit, and rescission.  After becoming aware of the state court action and the potential for a settlement in March 2005, the Trustee moved to re-open Mullen's bankruptcy case on the ground that the state court action was an asset of the estate.  Following a hearing held on April 12, 2005, the bankruptcy court granted the Trustee's motion to re-open the case.  Mullen filed a motion to convert the case to a Chapter 11 proceeding and the bankruptcy court granted her motion on April 27, 2005.

In July 2005, Kalil removed the state court action to the bankruptcy court.[4]  A five-day trial was held before Judge Mark Vaughn.  Eleven witnesses testified, including Mullen and Kalil.

## C.  **Bankruptcy Court Decision**

On September 14, 2007, the bankruptcy court issued a memorandum opinion finding that Mullen had failed to prove her claims.  The court concluded that Kalil and Mullen had an attorney-client relationship during three periods:  (1) from late 1998 to 1999 when Kalil negotiated with lenders on Mullen's behalf and when he guaranteed the Bank of New Hampshire note, (2) from March 2001 to July 2001 when Kalil attempted to sell the lease and when Mullen assigned the lease to Kalil, and (3) from December 2001 through January 2002 when Kalil represented Mullen in the JFZ negotiations.  Memorandum Opinion at 11-13, In re Mullen, Bk. No. 03-11963-MWV, Adv. No. 05-1113-MWV (Bankr. D.N.H.

---

[4] This case is known as adversary proceeding 05-1113-MWV. Mullen also filed another adversary proceeding in the bankruptcy court in June 2005 that is not relevant here, known as adversary proceeding 05-1095-MWV.  In that proceeding, Mullen sought to avoid the transfer of certain assets to Kalil as fraudulent transfers under the New Hampshire Fraudulent Transfer Act and as avoidable preferences under 11 U.S.C. §§ 544(b) and 548.  The bankruptcy court granted summary judgment for Kalil on these claims.

Sept. 14, 2007) [hereinafter "Mem. Op."].  The court then
concluded that a conflict of interest existed within the meaning
of the New Hampshire Rules of Professional Conduct during each of
the three time periods.  <u>Id.</u> at 15.

     Despite these findings, the court concluded that Mullen
failed to establish her breach of fiduciary duty claim because
she could not prove that she had suffered compensable damages.[5]
<u>Id.</u> at 16.  The court also ruled in Kalil's favor on her claims
for violation of the New Hampshire Consumer Protection Statute,
misrepresentation, assumpsit, and rescission.[6]  <u>Id.</u> at 24-27.

## II.  <u>STANDARD OF REVIEW</u>

     This court has jurisdiction to hear appeals from final
judgments, orders, and decrees issued in bankruptcy court
pursuant to 28 U.S.C. § 158(a)(1).  When conducting this review,

---

     [5] The bankruptcy court alternatively found that Mullen
waived her conflict of interest claim because she had knowledge
of the conflict by retaining Kalil to represent her with
knowledge of the conflict.  Although Mullen challenges the
court's waiver ruling, I do not discuss it further because I
affirm based on Mullen's failure to prove damages.

     [6] Mullen does not challenge the bankruptcy court's rulings
with respect to these claims.

the court sits as an intermediate appellate court, in the same way that the federal courts of appeals normally hear appeals from the district courts.  28 U.S.C. § 158(c)(2); Bourne v. Northwood Props. LLC (In re Northwood Properties, LLC), 509 F.3d 15, 21 (1st Cir. 2007).  I review the bankruptcy court's conclusions of law de novo, and I review the court's factual findings for clear error.  See, e.g., Dahar v. Jackson (In re Jackson), 459 F.3d 117, 121 (1st Cir. 2006); Watman v. Grotman (In re Watman), 458 F.3d 26, 31 (1st Cir. 2006); Askenaizer v. Seacoast Redimix Concrete, LLC, Case No. 06-cv-123-SM, 2007 WL 959612, at *1 (D.N.H. Mar. 29, 2007).  "A finding is 'clearly erroneous' even if there is evidence to support it when the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.'"  Hannigan v. White (In re Hannigan), 409 F.3d 480, 482 (1st Cir. 2005) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)).

### III.  **ANALYSIS**

Mullen challenges the bankruptcy court's determination that she failed to prove compensable damages with respect to the June 2001 assignment of the lease and the January 2002 assignment of

-11-

the business.[7]  The bankruptcy court concluded that Mullen failed
to prove that she was damaged by either transaction because she
was compensated fairly for the property that she transferred to
Kalil pursuant to the assignments.  Mem. Op. at 16.  Mullen
argues that this ruling is clearly erroneous for two reasons.
First, she contends that she is entitled to recover the fair
market value of the transferred property without regard to the
consideration she received from Kalil because Kalil's breach of
fiduciary duty made the assignments voidable at Mullen's
election.  Alternatively, she argues that the bankruptcy court
erred both in determining the fair market value of the
transferred assets and in valuing the consideration that Kalil
paid to support the assignments.  I address each argument in
turn.

A.    **Requirement to Prove Damages**

     Mullen argues that because Kalil proceeded with the two
assignments despite an unwaived conflict of interest, the

_____

     [7] Mullen argued at trial that Kalil also breached fiduciary
duties he owed Mullen with respect to his handling of the Bank of
New Hampshire note, the potential sale of the lease to Binnie in
April 2001, and the potential sale of the business to JFZ in
December 2001.  I do not address these arguments because Mullen
has not pursued them on appeal.

transactions are voidable at Mullen's election and she is
entitled to recover the fair market value of the transferred
assets without regard to the consideration paid by Kalil.  In
essence, she argues that the relief she seeks is akin to
rescission, which can be awarded without proof of injury in
appropriate cases.

Mullen cites no authority for this unusual proposition, and
the cases she does cite are easily distinguishable because they
involved requests for rescission rather than a monetary award.
See BGJ Assoc. v. Wilson, 113 Cal. App. 4th 1217, 1229 (Cal.
App. 2d Dist. 2003) (allowing a client to void a contract with
an attorney, based on the attorney's violation of California
law); Petit-Clair v. Nelson, 344 N.J. Super. 538, 544 (N.J. App.
Div. 2001) (allowing a client to rescind a mortgage agreement
with an attorney, based on the attorney's violation of New
Jersey law); Gold v. Greenwald, 247 Cal. App. 2d 296, 313 (Cal.
App. 2d Dist. 1966) (allowing a client to terminate a business
relationship with an attorney, based on the attorney's violation
of California law).

As Mullen herself recognizes, rescission is no longer an
option in this case because both the lease and the business

-13-

assets have been resold.  Ordinarily, when rescission is not possible, the appropriate remedy is monetary damages, which must be proven by the party seeking damages.  See Record v. Rochester Trust Co., 89 N.H. 1, 192 A. 177, 183 (N.H. 1937) (declining to award rescission where the plaintiff could not demonstrate harm and stating:  "The courts do not reward one for being wronged, but act only to compensate and to prevent loss.").  Mullen fails to cite any case undermining this basic principle.  Therefore, she has failed to establish her claim that she is entitled to prevail without proof of damages.

**B.   Evidence of Damages**

Mullen also argues that the bankruptcy court erred when it found that "[t]here is insufficient evidence that any of Kalil's actions were intended to harm Mullen or actually caused the harm that she now alleges.  Further, there is insufficient evidence that Kalil's actions were intended for his own benefit or actually were beneficial to him." Mem. Op. at 16.  Mullen argues that the court erred with respect to the lease assignment when it credited the valuation opinion of Kalil's appraiser and found that Kalil paid adequate consideration for the assignment. She also argues that the court erred when it found that Kalil

-14-

paid adequate consideration for the assignment of the business assets.  I address Mullen's arguments with respect to each assignment in turn.

     1.  <u>Assignment of the Lease</u>

Mullen challenges the court's decision to credit Kalil's appraiser, who offered expert testimony estimating the value of the lease at $620,000 as of February 2002, over Mullen's appraiser, who appraised the lease at $1.3 million as of July 1, 2001.  <u>See</u> Mem. Op. at 19.  The court's decision to credit Kalil's appraiser is well-supported by evidence in the record, including the fact that actual income and expense data from the leasehold from 2003 to 2006 and the eventual sale price of the leasehold in 2006 corroborated the opinion of Kalil's appraiser and demonstrated that Mullen's appraiser was overly optimistic in his predictions.  <u>See</u> <u>id.</u>  The court also reasonably found that Mullen's appraiser did not adequately account for the renovations that would need to be completed in order to convert the building to office space.  <u>See</u> <u>id.</u>  For these reasons, I cannot conclude that the court committed clear error when it valued the leasehold at $620,000.

Mullen also argues that the court erred in calculating the consideration that Kalil paid for the leasehold because it included amounts listed in a declaration of consideration for the sale of K&W Fitness in January 2002.  See id. at 22.  Mullen is correct that the declaration of consideration for the sale of K&W Fitness does include some payments that actually served as consideration for the earlier assignment of the lease. Nevertheless, close examination of the relevant documents and the bankruptcy court's order demonstrates that the court did not err when it found that Kalil paid adequate consideration for assignment of the lease.

The assignment itself states only that it was given "for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged . . . ."  The consideration paid for the assignment can be inferred, however, from Mullen's testimony at trial and from paragraph 6 of the Option and Rental Agreement, which describes the amounts that Mullen would need to repay Kalil in order to exercise her option.  These amounts in paragraph 6 largely correspond to the amounts that Kalil agreed to pay on Mullen's behalf in return for assignment of the lease.

-16-

Mullen testified at trial, and paragraph 6 confirms, that, in return for the assignment, Kalil agreed to pay off the outstanding Bank of New Hampshire note ($215,757.25), advance money to Mullen for payroll expenses ($5,000), forgive outstanding legal bills ($4,052.72), allow Mullen to occupy the premises rent-free for three months ($37,500), make Mullen's lease payments to the Hyder Trust for three months ($15,630.30), make Mullen's installment payments on the Hyder Trust for three months ($8,056.83), and pay the taxes due on the property ($9,692.56).  Option and Rental Agreement at ¶ 6; Trial Transcript at 49, <u>In re Mullen</u>, Case No.03-11963, Adv. No. 03-1113 (Bankr. D.N.H. Aug. 30, 2006) (testimony of Mullen); <u>see also</u> Decl. of Consideration for Assignment of the Assets of K&W Fitness (describing amounts paid by Kalil on Mullen's behalf during the three-month period).  The total amount of money that Kalil agreed to pay in return for the assignment, therefore, was at least $295,689.66.  It was also the understanding of the parties that Kalil would continue to make payments on the Hyder Note and the Hyder lease after the three month period as well as certain additional payments, until Mullen exercised her option, in order to prevent the lease or any outstanding notes from

-17-

going into default.  Accordingly, Kalil made additional rental payments on the Hyder lease ($20,840.40), payments on the Hyder Note ($10,742.44), tax payments ($10,343.19), utility bill payments ($2,560.53), and payments for title work ($524).  The bankruptcy court included this amount ($45,010.56), offset by the $37,500 in rental payments that Mullen paid to Kalil in October through December 2001, as consideration for assignment of the lease.   Thus, the bankruptcy court concluded that Kalil paid at least $303,200 for assignment of the lease.  This conclusion is not clearly erroneous because Kalil's assumption of the additional amounts was contemplated by the parties, as evidenced by the Option and Rental Agreement at paragraph 6, and the payments were actually made by Kalil.

Although the leasehold interest was valued at $620,000 and Kalil paid only approximately $300,000 for the lease assignment, the bankruptcy court determined that Mullen received fair compensation for the assignment because Kalil also gave her an option to repurchase the lease.  Mem. Op. at 22.  As the court noted, when Mullen entered into the lease assignment, she had no substitute guarantor for the Bank of New Hampshire note, no buyer for the leasehold, and an under-performing business.  Id.

-18-

at 20-21.  The option agreement gave Mullen the ability to reacquire the leasehold by repaying Kalil for the debts he forgave and the payments he made pursuant to the assignment plus ten percent interest.  Accordingly, by taking the assignment and granting Mullen the option, Kalil provided Mullen with substantial debt relief, the ability to continue to operate the health club while she attempted to stabilize the business, and the right to reacquire the lease at a ten percent premium above Kalil's costs.  The bankruptcy court's determination that this consideration fully and fairly compensated Mullen for the assignment of the lease was not clearly erroneous.

  2. <u>Assignment of Business Assets</u>

  Mullen also challenges the adequacy of the consideration paid by Kalil for the assets of the business in the January 2002 transaction.  <u>See</u> Mem. Op. at 22-23.  This transaction included a declaration of consideration but, as discussed above, much of what was listed in the declaration actually served as consideration for assignment of the lease.  The declaration of consideration also provided, however, that, in addition to the amounts listed in the declaration, consideration included "[t]he assumption by Buyer (at Buyer's sole option) of certain other

-19-

debts or obligations of Seller owed to third parties."  Both

parties testified that it was their understanding that Kalil's

agreement to pay "certain other debts" constituted an agreement

by Kalil to repay as many of Mullen's creditors as possible.  See

Trial Transcript at 47, In re Mullen, Case No. 03-11963, Adv. No.

05-1113 (Bankr. D.N.H. Aug. 31, 2006) (testimony of Mullen);

Trial Transcript at 161-64, In re Mullen, Case No. 03-11963, Adv.

No. 05-1113 (Bankr. D.N.H. Sept. 7, 2006) (testimony of Kalil).

One of these "certain other debts" was the Hyder Note, which

Kalil paid off in November 2002 for $174,554.  The bankruptcy

court found that Kalil paid adequate consideration for the

assignment of the lease because he paid at least $174,554 for

assets that he was able to sell for only $100,000.[8]  See Mem. Op.

---

[8] Mullen challenges the valuation of K&W Fitness, arguing
that the actual value of the business assets in February 2002 was
$1,688,256.70.  Mullen bases this figure on numbers exchanged
during negotiations for the sale of the business to JFZ, LLC in
January 2002.  The bankruptcy court found, however: "There is
nothing to suggest that Kalil sold these assets for less than
fair market value.  As noted above, given Mullen's
characterization of Kalil's motivations, one should expect that
he sold the assets for as much as he could."  Mem. Op. at 22.
The court went on to note that the business had been
deteriorating, as shown in financial reports from 1997 to 1999,
and the court inferred that the business continued to deteriorate
from the fact that the business stopped preparing financial
reports in 2001.  The court also noted that the parties both

at 22-23.  The court concluded that the additional $74,554
constituted consideration for the entire group of assignments,
including the assignment of Mullen's rights under the Option and
Rental Agreement and the assignment of the trade names, bank
accounts, and leases held by K&W Fitness.  <u>Id.</u> at 23.  Mullen has
failed to demonstrate why this conclusion was clearly erroneous.

In summary, because Mullen has failed to show that the
bankruptcy court erred when it concluded that she did not prove
damages arising from the conflict of interest, I cannot overturn
the bankruptcy court's ruling with respect to her breach of
fiduciary duty claim.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, the judgment of the bankruptcy
court is affirmed.

---

testified that membership dropped off in January 2002.  These
findings by the bankruptcy court are based in fact and are not
clearly erroneous.  I cannot overturn these findings in favor of
speculative valuation figures from the incomplete JFZ
negotiations.

SO ORDERED.


                                        /s/Paul Barbadoro
                                        Paul Barbadoro
                                        United States District Judge

August 6, 2008

cc:  Steven M. Latici, Esq.
     Terrie L. Harman, Esq.
     Daniel W. Sklar, Esq.
     Kenneth E. Rubenstein, Esq.
     William C. Saturley, Esq.
     Geraldine L. Karonis, Esq.